Bert J. Ferris v. Commissioner.
Ferris v. Comm'r
Docket No. 1595. United States Tax Court
1944 Tax Ct. Memo LEXIS 79; 3 T.C.M. (CCH) 1094; T.C.M. (RIA) 44336; October 18, 1944
*79 Martin W. Goldsworthy, Esq., 115 Rand Tower, Minneapolis, Minn. for the petitioner. Edward C. Adams, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income tax and penalties thereon for the taxable years 1935 to 1941, inclusive, as follows: 25%
50%
Year
Deficiency
Penalty
Penalty
1935
$52.72
$13.18
$26.36
1936
53.31
13.33
26.66
1937
57.45
14.36
28.73
1938
59.38
14.85
29.69
1939
59.25
14.81
29.63
1940
63.62
15.91
31.81
1941
139.58
69.79
Total
$485.31
$86.44
$242.67
Petitioner did not file income tax returns for the taxable years 1935 to 1940, inclusive, but he did file a return for 1941. Penalties have been added by respondent for failure to file returns for the years 1935 to 1940, inclusive, under section 291 of the Revenue Acts of 1934, 1936, 1938, and the Internal Revenue Code, and for fraud under section 293 (b) of the same Acts and the Code. The total amount of the deficiencies and penalties is $814.42. Findings of Fact During the taxable years, petitioner was single, had no dependents, and resided in Minneapolis, Minnesota. At the time of the hearing, *80 he was sixty years of age. Upon his graduation from high school in Dubuque, Iowa, in 1901, he secured a job with a railroad which was constructing double track throughout the west. Petitioner was a rod-man in a surveying unit and moved from town to town as the construction work progressed. In these towns, petitioner gambled in "faro bank and crap". In 1908 he came to Minneapolis where he secured a Hupmobile agency. He continued this business until 1910 when he entered into a venture for the manufacture of automobiles. Thereafter from 1911 to 1913, he was a taxicab starter; from 1913 to 1922, a private chauffeur; and from 1922 to 1934, he was unemployed, but he played poker for money. In June, 1934, petitioner commenced work as a bar porter in a cafe in Minneapolis, owned by Perley McBride and known as Perley McBride's Place. His duties consisted of cleaning cuspidors, flooding out bottles and keeping the establishment clean. His salary was between $15 and $18 per week. At the time he applied for the job, petitioner stated "I need work pretty badly". Prior to 1934, petitioner had been a member of the Eagles Lodge, but in that year he became delinquent in his dues and because of the *81 delinquency, his membership was discontinued. In the late part of 1934, or the early part of 1935, petitioner was promoted by Perley McBride to the position of manager of a dice gambling game run by the cafe, known as the "14 game". Petitioner kept records for the management of the receipts and disbursements of the game. He also made side bets for himself, not only with the person rolling the dice, but with any onlooker who wished to bet. The petitioner kept for himself the money that he won from these side bets and paid out of his own pocket any money that he might lose. He kept no books or records showing either the receipts or disbursements in connection with the side bets made by him. He continued making side bets until his employment with the cafe terminated in September, 1942. In 1936, the cafe was incorporated under the name of the Thorndike Cafe, and petitioner acquired one share of the stock and became secretary and treasurer of the corporation. Thereafter, he kept the corporation's books, made the bank deposits, signed the checks and generally handled the cash for the corporation. In the latter part of 1938, Perley McBride suffered a stroke and was unable to take an active *82 part in the business. Thereafter, while McBride was away, petitioner took complete charge of the cafe and handled all the cash coming in, made the deposits and paid the bills. In 1936 and 1937, petitioner purchased the following shares of stock: Date
Name of Stock
Purchase Price
Dec. 15, 1936
50 shares Kerlyn Oil Company
$325.00
Jan. 7, 1937
10 shares Kerlyn Oil Company
350.00
April 26, 1937
100 shares Kerlyn Oil Company
720.00
April, 1937
50 shares Mohawk Liquor Company
350.00
June 9, 1937
100 shares Mohawk Liquor Company
607.50
June 9, 1937
50 shares Bath Iron Company
600.00
July 10, 1937
100 shares Kerlyn Oil Company
645.00
August, 1937
50 shares TransAmericana
831.25
Total
$4,428.75
Petitioner rented a safe deposit box when he began acquiring these shares of stock, and he continued to keep the box during the remainder of the taxable years. Petitioner received dividends on his shares of stock. In 1937, he received dividends in the amount of $150; in 1938, $170.75; in 1939, $167.63; in 1940, $213.25; and in 1941, additional dividends, not reported in his return, in the sum of $10.75. Since July 27, 1920, and throughout the taxable years, petitioner *83 maintained a bank account at the Northwestern National Bank in Minneapolis. His balance in this bank as of December 31, 1934, was $410.27. No deposits had been made in this account from March 3, 1926, until August 6, 1934. During the taxable years, petitioner made total deposits in the account of $1,400, ranging in amounts from $100 to $500. Since January 8, 1926, and throughout the taxable years, petitioner maintained an account with the Minnesota Building & Loan Association in St. Paul, Minnesota. His balance in this account as of December 31, 1934, was $589. No deposits had been made in this account from January 8, 1926, to March 10, 1935. During the taxable years, petitioner made total deposits in the account of $2,125, ranging in amounts from $75 to $1,000. During the taxable years, the following amounts were credited to the petitioner's accounts in the two banks, either as interest or "dividends": 1935, $29.59; 1936, $55.05; 1937, $41.70; 1938, $37.49; 1939, $38.19; 1940, $66.70; and 1941, $68.90. During the taxable years, petitioner received as wages from Perley McBride or the Thorndike Cafe, Inc., the following amounts: Year
Total
1935
$1,287.62
1936
881.42
1937
890.73
1938
1,098.15
1939
1,227.75
1940
679.70
1941
1,305.00
*84 In addition to these wages, petitioner ate one meal each day at the cafe, during the taxable years, and the value of these meals was part of his compensation. The reasonable value of each meal was 25 cents. In 1938, petitioner purchased a new Plymouth automobile for which he paid $550; in 1941, he purchased a new Chrysler automobile for which he paid $800. He operated these automobiles during the taxable years for his pleasure and paid the maintenance expenses from his personal funds. The respondent determined that petitioner received taxable income from "salaries and other income" during the taxable years in the following amounts: 1935, $2,651; 1936, $2,651; 1937, $2,651; 1938, $2,651; 1939, $2,651; and 1940, $2,351. Respondent determined that petitioner realized as "additional salaries and other income" which was not reported in his income tax return for the year 1941, the amount of $1,375. The basis of the amount of $2,651, which respondent determined to be petitioner's "salary and other income" is as follows: (a) Salary from Thorndike Cafe,
52 weeks at $25 per week
$1,300.00
(b) Value of meals taken at cafe as
part of petitioner's compensa-
tion. 700 meals at $.25 each
175.00
(c) Income from side bets on "14"
dice game or from other undis-
closed sources
1,200.00
Total
$2,675.00
(d) Less dues to Bartender Union
24.00
Total
$2,651.00
*85 His determination of $2,351 for the taxable year 1940 was based on the fact that the Thorndike Cafe was closed for six weeks in that year so that petitioner realized $150 less in salary and $150 less in side bets or income from other undisclosed sources during that year. The item of $1,375 designated as "additional salaries and other income" for 1941 consisted of $175 for meals and $1,200 in income from side bets on the "14" game, or from other undisclosed sources. Petitioner did not file income tax returns for the taxable years 1935 to 1940, inclusive. He has not shown that the failure to file such returns was due to reasonable cause. Petitioner filed a return for the taxable year 1941 in which he disclosed net income in the amount of $1,357.25. Respondent determined that for the years 1935 to 1940, inclusive, petitioner was entitled to a deduction of $35 for contributions and $50 for taxes. The following table represents respondent's determination of petitioner's gross income and taxable net income for each of the taxable years: Gross Income
Salaries and
Taxable
Year
Other Income
Interest
Dividends
Total
Net Income
1935
$2,651.00
$ 9.42
$2,660.42
$2,575.42
1936
2,651.00
25.90
2,676.90
2,591.90
1937
2,651.00
28.42
$112.50
2,791.92
2,706.92
1938
2,651.00
23.73
170.75
2,845.48
2,760.48
1939
2,651.00
23.22
167.63
2,841.85
2,756.85
1940
2,351.00
16.26
213.25
2,580.51
2,495.51
1941
2,814.73
*86 Petitioner received taxable income during the years 1935 to 1940, inclusive, as follows: Income From Side
Bets on
Value of Meals
"14" Dice
Taken at Cafe
Game or
Interest
as part of
From Other
From
Petitioner's
Undisclosed
Bank
Year
Wages
Compensation
Sources
Dividends
Accounts
Total
1935
$1,287.62
$78.25
$1,200.00 $ $29.59
$2,595.46
1936
881.42
78.25
1,200.00
55.05
2,214.72
1937
890.73
78.25
1,200.00
150.00
41.70
2,360.68
1938
1,098.15
78.25
1,200.00
170.75
37.49
2,584.64
1939
1,227.75
78.25
1,200.00
167.63
38.19
2,711.82
1940
679.70
69.25
1,050.00
213.25
66.70
2,078.90
In 1941, petitioner received additional income in the amount of $1,278.25 which was not reported in his income tax return for that year. His taxable net income for the year 1941 was $2,717.98. A part of the deficiency for each of the taxable years, 1935 to 1941, inclusive, was due to fraud with intent to evade tax. Opinion The principal issues in this proceeding are (1) whether the respondent erred in determining that petitioner received income during the taxable years which should have been reported by him, *87 and (2) whether the respondent erred in determining that a part of the deficiency for each of the taxable years was due to fraud with intent to evade tax. The burden of proof as to the first issue is upon petitioner and the burden of proof as to the second issue is upon the respondent. . The deficiencies are based upon respondent's determination that petitioner received income during the taxable years in the form of wages and meals from the Thorndike Cafe, interest on bank deposits, dividends on stocks, and income from side bets on the "14" game or from other undisclosed sources. The deductions allowed by respondent are not in issue and there is no real dispute between the parties on the amount of wages received, the value of the meals, the interest on the bank deposits or the dividends on the stocks. Respondent apparently concedes that the amount of wages and the value of the meals received by petitioner should be adjusted according to the proof adduced at the trial. He had originally determined that petitioner's wages from the cafe amounted to $1,300 annually. However, the records of the cafe show conclusively the amount of *88 wages received by petitioner during the taxable years and those amounts are shown in the findings of fact. Respondent also had originally determined that petitioner received 700 meals a year of two meals a day from the cafe and that the value of such meals was part of his compensation. However, the proof indicates that petitioner received only one meal a day. We have found that the reasonable value of each meal was 25 cents and that petitioner received six meals a week from the cafe as part of his compensation. There is no dispute as to the amount of interest received on the two bank accounts as the records of the banks showing the amounts of interest credited to the accounts were received in evidence. Similarly, petitioner admits receiving dividends on his stocks in each of the taxable years 1937 to 1941, inclusive, but except for 1937, he was unable to state the amount of dividends so received. Accordingly, we have accepted his figure for 1937 and the respondent's figures for 1938 to 1941, inclusive. Petitioner did not file income tax returns for the years 1935 to 1940, inclusive. Under the Revenue Acts and the Internal Revenue Code for the years 1935 to 1939, inclusive, a return *89 was required of every individual, if single, having a net income of $1,000 or over. For the taxable year 1940, a return was required of every individual, if single, having a gross income of $800 or over. Since the deductions allowable to petitioner for each of the taxable years were $85, it is apparent that even without the income from gambling, petitioner was required to file a return and pay tax for all of the taxable years except 1935. However, the real controversy between the parties is over respondent's determination that petitioner received income during each of the taxable years at the rate of $100 per month from gambling on side bets in connection with the "14" game or from other undisclosed sources. Petitioner denied the receipt by him of any income from the side bets, although he admitted that they were of almost daily occurrence. He contends that he "broke even" in those bets. Petitioner did not keep any books or records showing receipts or disbursements with respect to the side bets from which his taxable income from this source could be ascertained. Respondent determined petitioner's income from these gambling operations by ascertaining the increase in petitioner's *90 net worth over the period of the taxable years. The Courts have approved that method of ascertaining income under those particular circumstances. ; ; ; . The use of this method is necessary here solely because of petitioner's failure to keep such records. Although this method may not reflect income exactly, there is no better means available under the circumstances. During the taxable years, petitioner's salary from the cafe was small, averaging between $15 and $25 a week. Yet, during that period, he expended $4,400 for the purchase of stocks, $1,350 for the purchase of two automobiles, and he deposited in his bank accounts the sum of $3,525. Petitioner did not testify as to his manner of living during the taxable years or the necessary monies expended by him during that period for living expenses, but he did admit that he personally paid the maintenance expenses of the two automobiles. On the record, it cannot be found *91 that any part of the bank deposits was from his wages from the cafe. Certainly, it would seem that those wages were expended for living expenses. Petitioner's case was founded solely upon his own testimony. He had no witnesses other than himself. His testimony was largely an attempt to explain the source of the funds used to purchase the stocks and automobiles, and the deposits in the two bank accounts. He testified that at the end of the year 1934, he had the sum of $8,500 in cash in an unlocked wooden box which he kept in a trunk in a room shared by him with his brother. He testified that this sum was the balance of $16,000 which he claimed he had won in gambling operations in 1905. On brief, he contends that the $8,500 was the source of the purchases and bank deposits made during the taxable years. The difficulty with this position, however, is that there is no testimony in the record that he used that sum for the stocks, automobiles, and bank deposits. At best, there is a mere inference to that effect. Petitioner's testimony on the witness stand was vague, self-serving, and at times inconsistent and contradictory. We do not believe that he had $8,500 in cash at the end of 1934. *92 Even if it be assumed, arguendo, that he had $16,000 when he came to Minneapolis in 1908, it would appear that most of that money was spent thereafter for living expenses. Petitioner testified that he lost between $1,000 and $1,500 in the automobile agency and manufacturing business. He then testified that he had no regular income from 1913 to 1934, a period of 21 years. From 1913 to 1922, he worked as a private chauffeur without receiving regular wages and during that period he received only $1,000. From 1922 to 1934, he was unemployed and his only source of income was from playing poker for money. He testified that he mostly won, but that his winnings did not cover his expenses. When he applied for the job of bar porter for the cafe in 1934, he stated that he needed work badly. In that year, he had been dropped from his lodge because of delinquency in his dues. We think a reasonable inference from the facts is that in 1934 petitioner's so-called bankroll had been substantially depleted. We also think it incredible that petitioner would keep $8,500 in cash in an unlocked wooden box at a time when he owned a safety deposit box in a bank and had two savings accounts. Similarly, *93 it is difficult to believe that petitioner, who was a skilled professional gambler, would continue to make side bets over a period of seven years and just "break even", especially in a game over which he presided. The credibility of petitioner is also weakened by another circumstance. Petitioner admitted on the witness stand that on December 23, 1942, at 2:15 P.M., he was asked by one of respondent's special agents if he would be willing to then go with the agent to make an inspection of petitioner's safety deposit box. Petitioner replied that he would be willing but that he did not have the key to the box with him. He then admitted that exactly 24 minutes later, at 2:39 P.M., he entered the bank alone and went to the box. Aside from tending to impeach his veracity, this would seem to indicate that the contents of the box were such as would not aid his thin contentions with respect to his tax position. We have therefore found that petitioner has failed to establish that respondent erred in his determination that petitioner received an average of $100 per month from side bets or from other undisclosed sources. It cannot be held that petitioner has succeeded in overcoming the correctness *94 of respondent's determination. Since petitioner has not attempted to show that the failure to file returns for the taxable years 1935 to 1940, inclusive, was due to reasonable cause, the 25 percent penalty is sustained. With respect to the fraud penalty, respondent has proceeded to carry the burden of proof imposed upon him in this issue. He has proved his case by showing the unexplained increase of petitioner's net worth during the taxable years. The evidence adduced shows that taxable income was realized during the years in controversy. The determination of fraud is made in each instance on the particular facts of the individual situation. After a full consideration of all of the facts of this proceeding, it is our opinion that petitioner's failure to file any returns of income for the years 1935 to 1940, inclusive, and petitioner's understatement of income for the year 1941, was due to fraud with intent to evade tax. ; , affirmed . Since part of the *95 deficiency in each year is due to fraud with intent to evade tax, the respondent's addition of 50 percent of the deficiency in each year as a penalty is sustained. Decision will be entered under Rule 50.